[S.F. No. 22999. In Bank. Nov. 5, 1973.]

In re LOY DALE WRIGHT on Disbarment.

**COUNSEL**

A. Leslie Meggs, Jr., for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal, Christopher M. Reuss and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—Petitioner, a member of the State Bar since his admission in 1955, was convicted in 1971 of a felony, violation of Penal Code sections 484-487, subdivision 1 (grand theft of $6,532.75 trust funds) by the Contra Costa County Superior Court. He was sentenced to state prison,

sentence was suspended and he was placed on probation for five years. Conviction was affirmed on appeal in an opinion certified for nonpublication (*People* v. *Loy Dale Wright*, 1 Crim. 9265, filed May 17, 1971). We then referred the matter to the State Bar for hearing, report and recommendation as to the nature and extent of discipline to be imposed. (Bus. & Prof. Code, §§ 6101, 6102.)

The record of petitioner's conviction in the grand theft action is "conclusive evidence of guilt" (Bus. & Prof. Code, § 6101)[1] and prior to 1955 such conviction would have resulted in automatic disbarment (Stats. 1939, ch. 34, p. 357). ■ Since that date the vast majority of grand theft convictions of attorneys have resulted in disbarment or resignation with prejudice (see *In re Urias* (1966) 65 Cal.2d 258, 262, fn. 5 [53 Cal.Rptr. 881, 418 P.2d 849]) but the facts and circumstances of the conviction are relevant upon the issue of *discipline* (*In re Smith* (1967) 67 Cal.2d 460, 462-463 [62 Cal.Rptr. 615, 432 P.2d 231]).

Petitioner had no prior *disciplinary* record. However, there was also presented to the State Bar the facts and circumstances of a 1971 judgment in a civil fraud action based on misappropriation by petitioner of trust funds of another client, the use of a portion of those funds to make restitution to the grand theft victims, and the use of the remainder for his personal benefit. Judgment was entered for plaintiff in the sums of $20,275 compensatory damages, $3,311.58 interest, and $25,000 punitive damages. It was not appealed. (Pacheco v. Wright, Santa Clara County Superior Court, No. 237014, filed Nov. 18, 1971.)

The special administrative committee of the State Bar unanimously recommended that petitioner be suspended for one year followed by five years' probation with terms including full restitution. The disciplinary board adopted the findings, with minor modifications, but recommended disbarment, by a vote of 10 to 1, with 1 not voting.

The return to order to show cause why an order of disbarment should not be made may include a request for termination of the suspension and dismissal of the disciplinary proceeding upon the ground that the crime and the circumstances of the commission did not involve moral turpitude, and may include any facts or points relied upon with respect to the imposition or extent of discipline. (§ 6101.)

Petitioner concedes that the crime of which he was convicted involves moral turpitude but denies that he was guilty of any wrongdoing in the

---

[1]Unless otherwise noted all statutory references herein are to the Business and Professions Code.

matter involved in the civil proceeding. Despite the overwhelming evidence against him and the fact that the trial court which heard him, the special administrative committee which heard him and reviewed the transcripts and the disciplinary board which reviewed the transcripts in the criminal and civil actions (§§ 6049.1, 6049.2) and in the special administrative committee hearing, rejected his testimony that the transaction there involved was a "loan" and not a misappropriation of trust funds, petitioner states in his return that he sincerely believes he is a proper subject for less severe discipline than disbarment. He cites as special circumstances to be considered by this court in determining the discipline to be imposed, that he has already been suspended three years from practice, was incarcerated five and one-half months,[2] has made restitution of the funds involved in the grand theft conviction, and that fellow attorneys, judges, and the victims of the grand theft have written letters of recommendation of leniency in his behalf. He fails to acknowledge the significant factor that restitution was neither timely nor voluntary, as hereinafter will be shown.

The findings in the civil action are not binding upon this court in this proceeding, nor is this court bound by the conflict of evidence rule in reviewing recommendations of the board. We exercise an independent judgment on the facts but, as we noted in *Lefner* v. *State Bar* (1966) 64 Cal.2d 189, 192-193 [49 Cal.Rptr. 296, 410 P.2d 832], if the findings of the trial court and the findings of the board are supported by substantial evidence they come to us with a strong presumption of validity. The burden is upon the one seeking a review of the recommendation of the board to show that its findings are not supported by the evidence, or that its recommendation is erroneous or unlawful.

From our independent review of the evidence we have concluded that petitioner has not sustained this burden.

*Shehorn Matter.*

Petitioner was retained by Mr. and Mrs. Shehorn to prosecute a claim for damages on behalf of their minor daughter, Janis. Settlement was reached in January 1969 in favor of the Shehorns in the sum of $9,750. On January 30 the court approved compromise of the minor's claim; allowed $2,000 attorney's fee to petitioner and $1,217.25 to a doctor; and ordered that the net proceeds, $6,532.75, when received should be deposited in a savings account in a named bank, that petitioner act as trustee of the account, and that no withdrawals be made without prior

---

[2]Apparently the incarceration mentioned was in connection with a federal conviction for failure to file income tax returns for 1963 and 1964.

court order. Petitioner told his clients at that time that the money could be expected in about three weeks.

On February 7 the insurance company sent petitioner a settlement check for $9,750, asked that he have the release signed before passing on the check and asked that he *return* a filed copy of the dismissal with prejudice to the company. Petitioner had the Shehorns sign the release and endorse the check on February 9. That same day he deposited it in his trustee account, in which there was then a balance of $49.99, and he wrote a check on this account payable to himself in the sum of $1,450. On February 10 he wrote a check payable to Anwright Corporation in the sum of $2,500 and one payable to Coast Pump Company in the sum of $5,800. By February 11 all three checks had cleared his trust account, leaving the balance again at $49.99.

Anwright was a financially failing corporation in which petitioner had a 20 percent interest and in which he had continuing financial obligations of a substantial amount. Coast Pump was owned by the persons who owned the 80 percent interest in Anwright and they were pressuring him to pay up his share of the Anwright obligations. The $5,800 to Coast Pump represented part of his remaining investment obligation in Anwright. At that time petitioner knew the precarious financial condition of Anwright and of himself, he had large unpaid debts, and he intended to use the Shehorns' settlement proceeds for his own benefit.

Petitioner did not inform his clients or the court of his disposition of the proceeds. He evaded the inquiries of his clients and he falsely represented to them that the bank or insurance companies had lost the papers and caused some delay. On June 6 his clients wrote to Judge Cooney, who had approved the settlement; the judge contacted the insurance company and discovered that the check had been promptly issued and forwarded to petitioner; and the judge telephoned petitioner for an explanation. Petitioner falsely told him that he had not received the check. It was not until late June that petitioner admitted to his clients or to the judge that he had to "borrow" the money because of personal financial problems and that he had used the trust moneys in a personal business venture. The only "justification" made by him was that he had been anticipating momentarily the receipt of legal fees in another matter which had been unforeseeably delayed. At the time of these admissions he was under the threat of disciplinary and criminal proceedings. ▮ He promised to make restitution and he did—but with funds misappropriated from another client. Such restitution entitles him to no indulgence. (*Tardiff* v. *State Bar* (1971) 3 Cal.3d 903 [92 Cal.Rptr. 301, 479 P.2d 661].) Thereafter he

was charged with grand theft based on misappropriation of the Shehorn settlement proceeds. At the trial he testified that when he deposited the proceeds in his trust account his account was already subject to large overdrafts, and that he hoped he could obtain money from an unrelated case to enable him to make good the misappropriation of the Shehorn settlement. On appeal it was held that the evidence amply supported every element of the crime of grand theft (embezzlement).

### Pacheco Matter.

In early March 1968 Mrs. June Pacheco (a woman 46-50 years of age) and her husband were injured in an automobile accident. They retained petitioner to prosecute their claim for damages. A compromise settlement resulted in the distribution to her of $36,750 and check in that amount was sent to petitioner by the insurance company together with releases. Mrs. Pacheco was severely and extensively injured in the accident, was undergoing intense pain, had emotional problems (threatened breakup of her 20-year marriage and her son's various difficulties with the law) and had financial problems. On June 30, 1969, petitioner took the settlement draft and the releases to the Pacheco home. Mr. Pacheco signed inside the house. Mrs. Pacheco accompanied petitioner to his car and signed the note there as she had matters to discuss with him regarding her welfare status and the handling of the proceeds, and did not want her husband to hear the conversation.

Prior to the settlement of the personal injury claim Mrs. Pacheco indicated to petitioner that she was interested in investing a portion and in having a portion put in trust so that she could have a monthly amount for living expenses. They discussed this again when she signed the settlement check. Petitioner then gave her a promissory note for $25,000 (her share of the proceeds after agreed upon deductions).[3] The note was hand-

---

[3]Thereafter, on July 22, 1969, while petitioner and Mrs. Pacheco were at the courthouse in Hayward in connection with a criminal case involving her son, petitioner gave her a handwritten breakdown as follows:

| | | |
|---|---:|---:|
| Total Settlement | | $38,250. |
| Agreed fee 25 percent | $ 9,562.50 | |
| Mr. Pacheco (total payment) | 1,500.00 | |
| Repayment of loan to Ted | 500.00 | |
| Retainer fee for Ted | 500.00 | |
| Check to Mrs. Pacheco | 1,187.50 | |
| PN note | 25,000.00 | |
| | $38,250.00 | |

At his dictation she added "Received of Dale Wright on July 1, 1969, promissory note for $25,000 with payment of $250.00 per month due me. . . ."

written by him on his office stationery; was dated June 30, 1969; it provided for interest payments at 10 percent per annum, payable monthly commencing August 1, 1969, with a due date of July 1, 1975; and stated that "This note shall be secured by a pledge of the stock to be issued by Anwright Corp., a California Corporation, to the undersigned. Said stock represents approximately twenty percent (20%) of the proposed stock issuance presently in said corporation."

The stock was never issued by the company. No security was ever given by petitioner to Mrs. Pacheco for the note. No memorandum for the files or for his client was made by him explaining the transaction. At that time petitioner was under threat of disciplinary and criminal proceedings to repay the moneys misappropriated from the Shehorns. He was overdrawn on his office checking account with the bank during the period of February through June 1969 and was personally insolvent. He had financial obligations totaling $30,000-$40,000 exclusive of what he owed on the family home, and that home was homesteaded.

On the following day, July 1, petitioner deposited $8,500 of the Pacheco proceeds in his commercial account; deposited the balance in his trust account, which at that time had a balance of $59.59; and made restitution to the Shehorns out of the trust account. Within three months he had used the entire balance for his own use and benefit. He continued to make payments of $250 a month to Mrs. Pacheco until March 1970. On one occasion, at her request, he gave her a check for $2,000.

On April 23, 1970, Mrs. Pacheco filed a civil fraud action in Santa Clara County. There, as in this proceeding, petitioner maintained that the $25,000 was *loaned* to him by Mrs. Pacheco in exchange for his promissory note, that there was no misappropriation because it was his money to do with as he pleased, that there was no confidential relationship between himself and Mrs. Pacheco at that time, and that he told her the money was going into a business venture and that is where the money went.

The trial court found that there was a confidential relationship between the parties at the time petitioner gave Mrs. Pacheco the promissory note and deposited the settlement proceeds in his bank accounts; that prior to the settlement of the action they had discussed the investment of these proceeds and petitioner had represented to her that if she would permit him to retain $25,000 from her share he would hold it as trustee for her and invest it for her benefit as he often made investments for clients; that he made these representations for the express purpose of inducing her to allow him to retain these moneys; that she did rely upon his representa-

tions; and that she would not have permitted him to retain the $25,000 had the statements not been made because there existed between them a fiduciary and confidential relationship. Furthermore, the court found that Mrs. Pacheco had no business experience or prior experience with promissory notes, that she relied upon his experience and judgment and did not discuss investment of these proceeds with anyone else, and that she did not discover the true nature and effect of the purported promissory note and the fact that petitioner had wrongfully used the moneys for his own benefit and purpose until about March 1, 1970.

In his testimony before the special administrative committee petitioner agreed that this was not the kind of business investment that he as an attorney would have recommended. However, he did not consider that he was in a fiduciary relationship with her at that time because she mentioned she was going to get a divorce and did not ask him to represent her. He explained the deposit of a portion of the proceeds in his trust account as follows: first, that it was not commingling of clients' funds because there was only a $59 balance at that time; second, that he wanted to keep them out of the reach of creditors; that if he put them "in a regular commercial account it would be reachable by a writ of attachment at that time"; that he always had a $5,000 note to the bank outstanding "so that nobody could come in and zap [his] bank account. So anything above that $5,000 note probably I had it setting in the trust account so it could not be reached by a writ of attachment. . . ." At the time of the hearing petitioner had paid less than $200 in restitution to Mrs. Pacheco since the civil judgment. With regard to the punitive damages he testified that "[T]he judge found . . . that either there was undue influence or something, fraud or some damn thing, and I got nailed for $25,000 punitive damages. So, you know, I'm on the hook. I have no objection to paying her $25,000 but I'll tell you right now for the record she's going to have one hell of a time on that extra twenty-five thousand. I'm sure she'll get it, but they are going to earn that last twenty-five thousand. I owe her the first. The second I'll deal with."

The committee recommended that petitioner be suspended until August 29, 1973; that terms of probation include his making full restitution to Mrs. Pacheco, plus accrued interest during the period of his probation; and that he not practice as a sole practitioner for three years of his probation or be solely responsible for handling of clients' funds during the entire probationary period. The board recommended disbarment.

■ The record discloses serious and wilful misconduct in violation of petitioner's obligations as an attorney at law and officer of the court and

lack of the requisite moral fitness to be held out as a member of the State Bar. In addition to the conviction of grand theft, a felony involving moral turpitude, and one which normally calls for disbarment, petitioner misappropriated the funds of another client; practiced fraud and deceit upon his clients and upon Judge Cooney; commingled clients' funds; and, by his manner of handling his office bank accounts, engaged in fraud upon creditors. Restitution made to the Shehorns does not call for any act of clemency. Restitution made to Mrs. Pacheco is of little weight, in view of his persistence in his patently false account that he made restitution to the Shehorns from funds "loaned" to him by Mrs. Pacheco, and his lack of repentance with regard to the Pacheco matter. His attitude does not reflect present rehabilitation.

No clearly extenuating circumstances are shown. The letters from petitioner's fellow lawyers, judges, and the Shehorns, victims of the grand theft, are in his favor but they are not conclusive in the absence of a showing by petitioner of a "proper attitude of mind regarding his offense" (see *Feinstein* v. *State Bar* (1952) 39 Cal.2d 541, 547 [248 P.2d 3]). His explanation that he was under financial pressure because of his business venture commitments and that he was having financial and domestic problems may explain his actions but they do not excuse his violation of his oath and duties as an attorney at law. His explanation that in law school he was instructed in legal ethics but not in how to handle a trust account deserves no comment.

Disbarment is necessary to protect the public and to maintain public confidence in the courts and the legal profession.

It is therefore ordered that petitioner, Loy Dale Wright, be disbarred from the practice of law in this state, and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this opinion.